**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**


**JENNIFER CHRISTIAN, formerly**
**known as JENNIFER HAVEMAN,**                    **3:16-cv-01938-BR**

        **Plaintiff,**                    **OPINION AND ORDER**

**v.**

**UMPQUA BANK, an Oregon-for-**
**Profit Banking Institution,**

        **Defendant.**

**CRYSTAL M. LEWIS**
March, Higgins, Beaty & Hatch, P.C.
1112 Daniels St., Suite 200
P.O. Box 54
Vancouver, WA 98666
(360) 695-7909

        Attorneys for Plaintiff

**LEAH C. LIVELY**
**WM. BRENT HAMILTON, JR.**
Davis Wright Tremaine, LLP
1300 S.W. Fifth Ave, Suite 2400
Portland, OR 97201
(503) 241-2400

        Attorneys for Defendant

**BROWN, Senior Judge.**

    This matter comes before the Court on Defendant Umpqua

Bank's Motion (#49) for Summary Judgment.  After reviewing the

1 - OPINION AND ORDER

parties' pleadings the Court concludes the record is sufficiently developed, and, therefore, oral argument is unnecessary.

For the reasons that follow, the Court **GRANTS** Defendant's Motion.

## BACKGROUND

The following facts are taken from the Joint Statement of Facts (#48) and the parties' summary-judgment materials and are undisputed unless otherwise indicated.

In 2009 Defendant hired Plaintiff Jennifer Christian (formerly known as Jennifer Haveman) as a Universal Associate.

Between 2011 and September 2014 Plaintiff worked at Defendant's downtown Vancouver location.

In approximately 2013[1] Plaintiff opened an account for a customer referred to as "Brad."[2]  Plaintiff encountered and assisted the Customer on other occasions at the bank.  In late 2013 or early 2014 Plaintiff received two or three notes from the Customer.  Plaintiff does not recall how she received the notes or whether she had any contact with the Customer.  In one note he told Plaintiff that she was beautiful and in another note he said he wanted to go out with her.  After receiving the notes Plaintiff encountered the Customer at the bank and told him that

---

[1]  The record does not reflect when Plaintiff initially opened the Customer's account.

[2]  The parties refer to the customer only as "Brad" for privacy reasons.  The Court will refer to Brad as "the Customer."

she did not want to go out with him, to which he responded "ok." The Customer did not attempt to touch Plaintiff physically nor did he say anything threatening or offensive to her. Plaintiff did not tell the bank manager, Chris Sanseri, about these notes.

In early February 2014 Plaintiff received a letter from the Customer at the bank. Plaintiff did not see the Customer deliver the letter or interact with him. In the letter the Customer said things such as Plaintiff was the most beautiful woman he had ever seen, Plaintiff was his dream girl, they were meant to be together, and he wanted to be with her. Plaintiff shared this letter with Sanseri and other employees.

On Valentine's Day 2014 the Customer sent Plaintiff flowers and a card at the bank. Plaintiff was not at the bank when the flowers were delivered by a florist.

Plaintiff discussed receiving the flowers and the first letter with Sanseri. Plaintiff expressed concern for her safety and told Sanseri that she thought it was a bad idea for the Customer to be allowed in the bank. Sanseri agreed and stated he "would not allow [the Customer] to come back" and if the Customer did return, Sanseri "would immediately tell him that he was no longer allowed to come back in the bank." Sanseri asked Plaintiff whether she was comfortable calling the Customer to tell him that the flowers and letters were not appropriate. Plaintiff contends Sanseri said it would be better if Plaintiff told the Customer herself. Plaintiff also contends although she was not comfortable calling the Customer, she agreed to do so

"because it was apparent to her that Sanseri did not want to do it."

Plaintiff called the Customer and told him the flowers were inappropriate and that she was not interested in dating him. The Customer responded "ok."

A few days after the telephone call the Customer left a second letter for Plaintiff at the bank. Again, Plaintiff was not present when the letter was delivered, and she did not have any interaction with the Customer. The second letter included statements similar to those in the first letter.

Plaintiff did not have communications from the Customer or see him again until September 2014.

On Saturday, September 13, 2014, Plaintiff was volunteering at a community block party. Defendant supports community events, encourages employees to volunteer, and routinely sends out an ice-cream truck to hand out free ice cream. Plaintiff arranged for the bank's ice-cream truck to be present at this community event, and she handed out the ice cream. During this event Plaintiff saw the Customer sitting on a wall near the truck and looking in her direction. Plaintiff does not have any information that the Customer came to the block party because of her or that he had any way of knowing Plaintiff would be at the block party. Plaintiff did not have any interaction with the Customer at this time nor does she recall telling Sanseri about this incident.

On September 23, 2014, the Customer came into the bank to

open a new bank account.[3]  That day Plaintiff was assigned to
work the new-accounts desk.  Sanseri asked Plaintiff to open a
new account for the Customer.  Plaintiff told Sanseri that she
did not feel comfortable opening the account because "that was
[the Customer]" who had sent her flowers in February and was not
supposed to return to the bank.  Sanseri had not previously seen
the Customer, could not identify him, and did not remember the
situation.  Sanseri, however, asked another associate to assist
the Customer.  Plaintiff, therefore, did not interact with the
Customer although he "continuously looked in Plaintiff's
direction."

On September 26, 2014, the Customer again returned to the
bank "to hang out in the lobby."  The Customer had interactions
with other employees and "stared" at Plaintiff, but he did not
speak to or have any contact with her.  Following this incident
Plaintiff called Dan Souvenir, a former area manager, about the
situation.  After speaking to Souvenir Plaintiff called Bobbi
Heitschmidt, the current area manager, and left a voicemail.
Plaintiff also called and left a message for Kris Wolfram in
Defendant's Human Relations Department.  Heitschmidt returned
Plaintiff's call later that day and asked her whether the
Customer was still in the store and whether Plaintiff was in
immediate danger.  Plaintiff told Heitschmidt that she was
"fearful for her safety."  Heitschmidt said she would find a way
to help Plaintiff with the Customer.  Following her conversation

_____

[3]  In July 2014 the Customer had closed his prior account.

with Plaintiff Heitschmidt contacted Sanseri and Melissa
Gonzales, Vice President of Corporate Security.  Gonzales told
Heitschmidt that the bank could apply for a no-trespassing order
against the Customer if he posed a physical threat or if there
was reason to believe there was a risk of imminent danger or harm
to Plaintiff.  Wolfram also returned Plaintiff's call on the same
day.  Plaintiff told Wolfram about all of the past incidents and
that she was afraid of the Customer.  Wolfram said she would call
Sanseri and Heitschmidt and then call Plaintiff back after she
had more information.  Wolfram told Plaintiff that she should go
to the breakroom in the back of the building if the Customer
returned.  After speaking with Heitschmidt, Sanseri met with
Plaintiff to discuss Plaintiff's concerns and to reassure
Plaintiff that the bank would take immediate action.  Sanseri
told Plaintiff that he had also spoken to Gonzales about getting
a no-trespass order and that the bank could either close the
Customer's account or ask him to go to another location.
Plaintiff went home for the weekend after this meeting .

      On September 29, 30, and October 1, 2014, Plaintiff called
in sick.  Sanseri or Heitschmidt called Plaintiff each day to ask
how she was feeling and to find out when she would return to
work.  Sanseri told Plaintiff that Defendant had not obtained a
no-trespassing order; that the bank was short-staffed; and if
Plaintiff returned to work, she could hide in the breakroom in
the event the Customer returned.  Plaintiff told Sanseri that she
did not want to return to that branch because she feared for her

safety.

On October 1, 2014, Sanseri called Plaintiff at home and told her that he wanted to meet with her when she returned to determine whether Plaintiff had any evidence that the Customer threatened her or said or did anything that showed the Customer was an imminent danger to Plaintiff.

On October 2, 2014, Plaintiff met with Sanseri, Heitschmidt, and Wolfram to discuss various options to address the situation, including a location transfer, closing the Customer's account, and investigating a no-trespassing order against the Customer. Wolfram asked Plaintiff to prepare a letter that described the incidents in order to assist the bank in obtaining a no-trespassing order and that listed Plaintiff's proposed solutions that would allow Plaintiff to return to work.

On October 4, 2014, Plaintiff sent a letter (dated October 3, 2014) to Wolfram. Plaintiff stated she was making a "formal complaint" that she was "sexually harassed" by the Customer. Plaintiff summarized the events and requested, among other things, that the bank obtain a no-trespassing order against the Customer; the bank close the Customer's account; the bank transfer Plaintiff to the Salmon Creek location; no one talk to others about the reason for Plaintiff's transfer; Sanseri, Heitschmidt, and another employee participate in sensitivity training and "not hassle" Plaintiff about the incidents; and Plaintiff have reasonable time off for medical appointments and mental-health counseling "to recover from this frightening and

threatening situation."

On October 4, 2014, Defendant closed the Customer's account and instructed the Customer that he could not return to any of Defendant's locations. Nevertheless, on October 6, 2014, the Customer went to the Vancouver location of the bank. Plaintiff was not present. Sanseri told the Customer that his account was closed and that he was not to return to any of Defendant's bank locations. The Customer has not returned to any of the bank's locations and has not had any further contact with Plaintiff.

Plaintiff was temporarily transferred to the Evergreen location that was managed by Lori Wick. Wick was aware Plaintiff needed a "safe place to work," but she was not aware that Plaintiff had complained of sexual harassment. Plaintiff worked at this location for a few weeks. While she was at the Evergreen bank Plaintiff made three "significant" errors that were documented by Wick in an October 16, 2014, email to Plaintiff. In her email response Plaintiff "accepted responsibility" for one of the errors. In her Complaint, however, Plaintiff alleges she was "counseled regarding several mistakes that she did not make."

Plaintiff was eventually transferred to the Salmon Creek location per her request. Plaintiff accepted a reduction in her work hours from 30 to 25 hours per week. Naomi Camargo, Manager of the Salmon Creek bank, was not informed about the reason for Plaintiff's transfer.

On November 12, 2014, Plaintiff made an error in a deposit when she entered $6,500 on a deposit slip instead of the actual

$65,000 maker-to-maker deposit.  Defendant contends Plaintiff made other errors and failed to perform other duties that were documented by Camargo.

On November 21, 2014, Camargo prepared a written disciplinary report regarding these errors, but she was unable to deliver it to Plaintiff before she resigned.

On November 26, 2014, Plaintiff emailed her resignation to Wolfram.  Plaintiff stated she was resigning because "[m]y doctor has declared it is bad for my health to continue working at Umpqua Bank."

On August 20, 2016, Plaintiff filed a civil action against Defendant in Oregon state court and alleged federal and Washington state-law claims of sexual harassment/discrimination and retaliation.

On October 4, 2016, Defendant removed the state-court action to this Court.[4]  On October 11, 2016, Defendant filed an Answer to Plaintiff's Complaint.

On March 20, 2018, Defendant filed a Motion (#49) for Summary Judgment.


## STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United*

---

[4] This Court earlier denied Plaintiff's Motion (#9) to Remand that was based on issues of service and the timeliness of removal.

*States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R. Civ. P. 56(a). The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id.* "This burden is not a light one . . . . The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted). A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07-CV-

1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011)
(citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.
1989)).  When the nonmoving party's claims are factually
implausible, that party must "come forward with more persuasive
evidence than otherwise would be necessary." *LVRC Holdings LLC
v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense
determines whether a fact is material. *Miller v. Glenn Miller
Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the
resolution of a factual dispute would not affect the outcome of
the claim, the court may grant summary judgment. *Id*.


## DISCUSSION

Defendant contends it is entitled to summary judgment
because there is not a genuine dispute of material fact and
Defendant is entitled to judgment as a matter of law on each of
Plaintiff's claims.  Plaintiff, in turn, contends there are
genuine disputes of material fact as to each of her claims from
which a reasonable juror could find in her favor.

**I.   Plaintiff's Sexual-Harassment Claim**

Plaintiff alleges she was subject to sexual harassment and
discrimination in violation of state and federal laws based on
the conduct of the Customer and Defendant's failure to prevent
the hostile work environment.

Defendant, however, contends Plaintiff cannot establish a

*prima facie* case of sexual harassment because the Customer's conduct was not sufficiently severe or pervasive to create a hostile work environment, and, in any event, the Customer's conduct cannot be imputed to Defendant.

**A.    Standards**

Under Title VII, 42 U.S.C. § 2000e, it is unlawful for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment because of her race, color, religion, sex, or national origin. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). Sexual harassment in the form of a hostile work environment constitutes unlawful discrimination. *Id*. To establish a *prima facie* case of sex discrimination based on a hostile work environment the plaintiff must show (1) she was subjected to verbal or physical conduct relating to a statutorily protected class of which she was a member, (2) the conduct was unwelcome, (3) the harassment complained of was so severe or pervasive as to alter the work environment, and (4) the defendant had notice of the harassment. *See Vasquez v. County of Los Angeles*, 394 F.3d 634, 642 (9th Cir. 2004). *See also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1119 (9th Cir. 2004).

To establish a hostile workplace claim under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, a plaintiff must show (1) unwelcome harassment (2) that is

attributable to plaintiff's membership in a protected class (3) that affected the terms and conditions of the plaintiff's employment (4) that is imputable to the plaintiff's employer. *Loeffelholz v. Univ. of Wash.*, 175 Wash.2d 264, 275 (2012). The objective severity of harassment is evaluated from the perspective of a reasonable woman. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). *See also Clark County School Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001).

Whether the work environment is "hostile" or "abusive" depends on all of the circumstance including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "It is the harasser's conduct [that] must be pervasive or severe, not the alteration of the conditions of employment." *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991). *See also E.E.O.C. v. Robert L. Reeves & Assoc.*, 58 F. App'x 830, 832 (9th Cir. 2003).

In addition to proving that sexual harassment occurred, the Plaintiff must also prove the employer is liable for the harassment. *Little v. Windermere Relocation, Inc*., 301 F.3d 958, 966, 968-69 (9th Cir. 2002). The Ninth Circuit has held sexual harassment on the part of a private individual may be imputed to the employer when "the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions

when it knew or should have known of the conduct." *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997). *See also Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006); *Davis v. Wash. State Patrol*, No. 71736-7-I, 2014 WL 5144762, at *9 (Wash. App. Oct. 13, 2014)(under WLAD conduct can be indirectly imputed to the employer if the employer knew or should have known about the hostile behavior and failed to take reasonable corrective actions to end the harassment). In such instances the hostile environment liability of the employer is grounded in negligence and ratification rather than intentional discrimination. *Swenson v. Potter*, 271 F.3d 1184, 1191-92 (9th Cir. 2001). Accordingly, after the employer becomes aware of the harassing behavior of the private individual, the employer is required to undertake remedial measures reasonably calculated to end the harassment. *McGinest v. GTE Svc. Corp.*, 360 F.3d 1103, 1120 (9th Cir. 2004). The reasonableness of such remedial measures depends on the employer's ability to stop the harassment as well as the promptness of the response. *Id*.

**B. Analysis**

Plaintiff concedes she was not concerned for her safety during her initial contacts with the Customer. In fact, the parties agree the Customer never attempted to touch Plaintiff and never said anything explicitly threatening or offensive to Plaintiff. Plaintiff contends, however, that the "escalating nature" of the Customer's conduct was sufficiently severe and pervasive to alter the conditions of her employment, and,

therefore, the Customer's conduct should be imputed to Defendant.

**1.    Hostile Work Environment**

Courts must determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000)(quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).  It is the harasser's conduct that must be pervasive or severe rather than alteration of the conditions of employment. *Ellison*, 924 F.2d at 878.

As noted, Plaintiff alleges several instances of contact with the Customer after she initially opened his account: (1) She received notes from the Customer in late 2013 or early 2014 stating Plaintiff was beautiful and that he wanted to go out with her; (2) she received a letter from the Customer in early February 2014 stating Plaintiff was beautiful, Plaintiff was the girl of his dreams, and he wanted to be with her; (3) she received flowers from the Customer on Valentines Day in 2014; (4) she received a letter from the Customer after she received the flowers; (5) she saw the Customer at a community event in September 2014; (6) she saw the Customer in the bank on September 23, 2014, when he came to open a new account; and (7) she saw the Customer in the bank on September 26, 2014,

when he came to "hang out" in the lobby.

Plaintiff concedes she did not advise Defendant that she received the notes from the Customer in late 2013 or early 2014 and did not notify Defendant that she saw the Customer at the community event. The record also reflects Plaintiff did not have any direct, personal interactions with the Customer on any of those occasions. All of these events occurred over a one-year period, and seven months elapsed between receipt of the flowers in February 2014 and when Plaintiff saw the Customer in September 2014 in a public place and then at the bank a few days later.

Defendant admits Sanseri told Plaintiff in February 2014 that the Customer would be asked to leave the bank if he returned, but when the Customer returned to the bank on September 26, 2014, Sanseri "forgot" about this conversation and asked Plaintiff to open an account for the Customer. Plaintiff acknowledges she explained to Sanseri who the Customer was, Sanseri did not recognize the Customer, Sanseri had another employee assist the Customer, and Plaintiff went to a break room until the Customer left. Without more, however, this single incident is not sufficient to constitute a hostile workplace.

On this record the Court concludes no reasonable juror could conclude after considering all of the circumstances that the Customer's actions were so severe or pervasive as to alter the conditions of Plaintiff's employment and to create a hostile work environment.

## 2. Imputed Conduct or Acquiescence

As noted, sexual harassment on the part of a private individual may be imputed to the employer when "the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997).

When advised of the incidents involving the Customer, Defendant immediately responded to Plaintiff's concerns. Sanseri met with Plaintiff after she received the flowers in February 2014 and decided the Customer would not be allowed to come back in the bank and the Customer should be told it was inappropriate to send flowers. Following the incident on September 26, 2014, Sanseri, Heitschmidt, and Wolfram met with Plaintiff to address her concerns. Although the bank was unable to obtain a formal no-trespassing order, the Customer's account was closed, he was instructed not to return to any of Defendant's locations, and Plaintiff was transferred to another branch per her request.

Even if the Customer's conduct could be considered sufficiently severe or pervasive to alter the conditions of Plaintiff's employment to the degree that is could be considered sexual harassment and created a hostile work environment, the record reflects Defendant took immediate and corrective action reasonably calculated to end the harassment, and Defendant did not ratify or acquiesce in the Customer's conduct sufficient to

impute the Customer's conduct to Defendant.

In summary, on this record the Court concludes no reasonable juror could conclude the Customer's actions created a hostile work environment sufficient to support a sexual harassment claim, and even if the Customer's actions could be considered sexual harassment, Plaintiff has not identified any facts to establish that Defendant ratified or acquiesced in that conduct. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's claims for sexual harassment under federal and state laws.

## II.  Plaintiff's Retaliation Claim

Plaintiff alleges Defendant retaliated against her after she made complaints about the Customer's sexual harassment.

Defendant, however, contends Plaintiff did not engage in any protected activity when she complained about the Customer's behavior, Plaintiff did not suffer any adverse employment action, and Plaintiff cannot show any alleged adverse actions were motivated by her complaints of sexual harassment.

### A.  Standards

To establish a claim for retaliation under Title VII and WLAD a plaintiff must establish (1) she engaged in a protected activity, (2) the defendant subjected her to an adverse employment action, and (3) a causal link exists between the protected activity and the employer's adverse action. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004). *See also Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir.

2003)(indicating Washington courts look to federal law when analyzing retaliation claims under WLAD).

To establish that an employment action was adverse the plaintiff must show a reasonable employee would have found the challenged action was "materially" adverse; *i.e.,* that the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). *See also Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). An action need not rise to the level of an ultimate employee action such as discharge to be materially adverse. *Ray*, 217 F.3d at 1242-43.

**B.   Analysis**

**1.   Protected Activity**

Under Title VII an employee engages in a protected activity when she opposes an unlawful employment practice such as sexual harassment that her employer has ratified or to which her employer acquiesced. 42 U.S.C. § 2000e-3(a).

Here Plaintiff asserts Defendant "retaliated against [her] after she complained about [the Customer's] sexual harassment." Compl. ¶¶ 25, 26, 37, and 38. Plaintiff asserts the following facts support her position: She complained to Sanseri in September 2014 that she could not open a new account for the Customer; she contacted Souvenier, Heitschmidt, and Wolfram on September 26, 2014, to report that Sanseri allowed the Customer to open an account over Plaintiff's objections and that she was afraid of the Customer; she "repeatedly" resisted

pressure to return to work at the downtown branch without any
protection to ensure her safety; and she insisted on a store
transfer before returning to work. Pl.'s Resp. (#57) at 37.
Although none of the activities described by Plaintiff constitute
an unlawful employment practice actually engaged in by Defendant,
Plaintiff contends the discriminatory acts of the Customer may be
imputed to Defendant because Defendant allegedly either ratified
or acquiesced in the Customer's conduct by not taking immediate
and/or corrective action. *See Folkerson*, 107 F.3d at 755–56.

The Court, however, has concluded Defendant did
not acquiesce or ratify the Customer's conduct, and, therefore,
the conduct of the Customer cannot be imputed to Defendant.
Accordingly, the Court concludes Plaintiff has failed to
establish that her complaints about the Customer's conduct
constituted a protected activity in opposition to an unlawful
employment practice by Defendant.

### 2. Adverse Employment Action

Plaintiff also alleges Defendant subjected her to
an adverse employment action.

Following Plaintiff's complaint's about the
conduct of the Customer, Sanseri, Heitschmidt, and Wolfram each
contacted Plaintiff to discuss the issue in direct response to
Plaintiff's complaints. Plaintiff thought she was being treated
rudely when Heitschmidt questioned her about the incident on
September 26, 2014, but that one incident does not rise to the
level of retaliation. As noted, a "materially adverse" action is

one that "might have dissuaded a reasonable worker from making or
supporting a charge of discrimination."  *See White*, 548 U.S. at
68.

The record also reflects Plaintiff was transferred
to another branch location at her request to make her feel safe
in the workplace.  Plaintiff testified in her deposition that the
following acts were retaliatory:  Wick and Camargo, who were
managers at the other locations where Plaintiff worked, made
negative statements about Plaintiff's work performance; Camargo
made statements about Plaintiff's clothing and reputation;
Camargo took sales and lending opportunities away from Plaintiff;
and Camargo complained about Plaintiff's performance after
Plaintiff resigned.  The record, however, does not contain any
objective evidence to support Plaintiff's argument that Camargo
or Wick took their actions because Plaintiff complained about the
Customer's harassment.  Accordingly, the Court concludes on this
record that Plaintiff has not established Defendant subjected her
to an adverse employment action,

### 3.  Causal Link

Even if the managers' actions could be considered
"adverse" employment actions, there is not any evidence that
their actions were "retaliatory."

Evidence that a decision–maker is aware of an
employee's protected activity is required to support a claim of
retaliation.  *See Raad v. Fairbanks N. Star Borough Sch. Dist.*,
323 F.3d 1185, 1997–98 (9th Cir. 2003).  *See also Stephens v.*

*Nike*, 611 F. App'x 896, 897 (9th Cir. 2015). Both managers stated they were unaware of Plaintiff's complaints about the Customer's conduct and that the actions they took were based solely on Plaintiff's performance while employed at their branches. Plaintiff does not provide any objective evidence to the contrary.

On this record the Court concludes there is not any evidence that Defendant retaliated against Plaintiff because of her complaints.

In summary, the Court concludes Plaintiff has failed to provide any evidence from which a reasonable juror could conclude Defendant retaliated against Plaintiff for engaging in any protected activity that resulted in an adverse employment action.

## **CONCLUSION**

For these reasons, the Court **GRANTS** Defendants' Motion (#49) for Summary Judgment and, accordingly, **DISMISSES** this matter **with prejudice**.

IT IS SO ORDERED.

DATED this 22nd day of May, 2018.

/s/ Anna J. Brown
_____
ANNA J. BROWN
United States Senior District Judge